**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| Dorado Gardens LLC; Dorado Park LLC, | |
| Plaintiffs, | **Civil No. 22-1402(GMM)** |
| v. | |
| David Efrón; Efrón Dorado, S.E., | |
| Defendants. | |

## OPINION AND ORDER

Before the Court are *Dorado Gardens LLC and Dorado Park LLC's Motion for Summary Judgment* and *Statement of Uncontested Material Facts in Support of Dorado Gardens LLC and Dorado Park LLC's Motion for Summary Judgment* ("Motion for Summary Judgment" and "Statement of Uncontested Facts") (Docket Nos. 19 and 20). The Court **DENIES** Plaintiffs' Motion for Summary Judgment.

### I.   FACTUAL AND PROCEDURAL BACKGROUND

This dispute arises from two real estate transactions between Plaintiffs Dorado Gardens LLC ("Dorado Gardens") and Dorado Park LLC ("Dorado Park") (collectively, "Plaintiffs" or "Dorado" or "Buyers") and Defendants Efrón Dorado, S.E. ("Efrón Dorado") and David Efrón ("Efrón") (collectively, "Defendants"). On December 23, 2021, Efrón entered into a Purchase and Sale Agreement ("Property A PSA") with Dorado Gardens for a parcel of land in Dorado, Puerto Rico ("Property A"). (Docket No. 1 ¶¶ 12, 14-18; 11

Civil No. 22-1402(GMM)
Page -2-

¶ 12, 14). That same day, Efrón Dorado entered a Purchase and Sale Agreement ("Property B PSA") with Dorado Park for an adjacent parcel of land ("Property B"). (Docket Nos. 1 ¶¶ 36-38; 11 ¶¶ 36-38). The PSAs for Property A and Property B (collectively "the Properties") provide for a 183-day due diligence period during which Plaintiffs could evaluate the state of the Properties. (Docket Nos. 1 ¶¶ 14-18, 36-38; 11 ¶¶ 14, 16, 17, 18, 36-38). Plaintiffs allege that during the due diligence period, Defendants provided Plaintiff Buyers with a Jurisdictional Determination of Wetlands and Delineation Report ("Wetlands Report") for the Properties. (Docket Nos. 1 ¶ 25, 45; 19 ¶¶ 35-36; 19-18; 19-19; 36-1 ¶¶ 34-35). The Wetlands Report revealed that portions of the Properties met wetlands criteria, making them, allegedly, unsuitable for Plaintiffs' intended use. (Id.).

Plaintiffs contend that prior to the execution of the PSAs, Defendants possessed and purposefully withheld the Wetlands Report, which would have revealed to Plaintiffs that the Properties were supposedly unsuitable for their intended use. (Docket No. 20 at 16-18). Plaintiffs further argue that following the execution of the PSAs, Defendants violated the terms of the PSAs by failing to timely disclose the Wetlands Report. (Docket No. 1 ¶ 56). Based on Defendants' alleged violation of the PSAs' terms, on June 23, 2022, Dorado Gardens sent Notices of Termination for both PSA's requesting that Defendants instruct that the escrow for both

Properties be returned to Plaintiffs. (Docket Nos. 1 ¶ 29-31; 11 ¶ 29-30). Plaintiffs argue that Defendants failed to do so. (Docket No. 20 at 2).

On August 25, 2022, Plaintiffs filed their Complaint against Efrón and Efrón Dorado. Plaintiffs raise four causes of action under Puerto Rico law: *dolo grave* (bad faith) under 31 L.P.R.A. § 6211; reimbursement for expenditures incurred by Buyers related to the Project; indemnity for damages incurred by Buyers as the alleged result of Defendant's alleged *dolus* and breach of contract; and specific performance requiring Defendants to return the deposit being held in escrow. (Docket No. 1 ¶¶ 52-79).

On August 30, 2023, Plaintiffs filed their Motion for Summary Judgment and Statement of Uncontested Facts. (Docket Nos. 19 and 20). Despite Defendants' untimely filing of their opposition to Plaintiffs summary judgement motion on October 16, 2023, the Court declined to deem Plaintiffs' Motion for Summary Judgment unopposed. (Docket Nos. 36 and 38). On November 13, 2023, Plaintiffs filed their reply to Defendants' opposition and nine (9) days later Defendants filed their surreply. (Docket Nos. 47 and 50).

## II.  LEGAL STANDARD

### A.  Fed. R. Civ. P. 56

Motions for summary judgment are governed by Federal Rule of Civil Procedure Rule 56. "Summary judgment is proper when there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Ramirez-Rivera v. DeJoy, No. 3:21-CV-01158-WGY, 2023 WL 6168223, at *2 (D.P.R. Sept. 22, 2023); *see also* Fed. R. Civ. P. 56(a). At the summary judgment stage of a dispute the Court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249(1986); *see also* Dusel v. Factory Mut. Ins. Co., 52 F.4th 495, 503 (1st Cir. 2022). A genuine issue of a material fact exists "if the evidence 'is such that a reasonable jury could resolve the point in favor of the non-moving party.'" Taite v. Bridgewater State University, Board of Trustees, 999 F.3d 86, 93 (1st Cir. 2021) (*quoting* Ellis v. Fidelity Management Trust Company, 883 F.3d 1, 7 (1st Cir. 2018)). A fact is material "if it 'has the potential of affecting the outcome of the case.'" Id. (*quoting* Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 25 (1st Cir. 2011)).

In granting a Rule 56 motion, the Court must conclude that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Calderon Amezquita v. Rivera-Cruz, 483 F.Supp.3d 89, 101 (D.P.R. 2020) (*citing* Celotex Corp. v. Catrett, 477 U.S. 317, 322(1986));

Civil No. 22-1402(GMM)
Page -5-

*see also* Cintron v. Hosp. Comunitario El Buen Samaritano, Inc., 597 F.Supp.3d 515, 526-27 (D.P.R. 2022) (*citing* Fed.R.Civ.P. 56(c)).

"The party moving for summary judgment has the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact" with definite and competent evidence. Condado 3 CFL, LLC v. Reyes Trinidad, 312 F.Supp.3d 255, 258 (D.P.R. 2018) (*quoting* Celotex Corp., 477 U.S. at 323). "Once the moving party has properly supported [its] motion for summary judgment, the burden shifts to the nonmoving party, with respect to each issue on which [it] has the burden of proof, to demonstrate that a trier of fact reasonably could find in [its] favor." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (*quoting* DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997)).

In reviewing a summary judgment motion, "[a]ll reasonable factual inferences must be drawn in favor of the party against whom summary judgment is sought." Cintron, 597 F.Supp.3d at 527 (*citing* Shafmaster v. United States, 707 F.3d 130, 135 (1st Cir. 2013)). However, the Court should not "draw unreasonable inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective." López-Hernández v. Terumo Puerto Rico LLC, 64 F.4th 22, 28 (1st Cir. 2023) (*quoting* Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007)).

Civil No. 22-1402(GMM)
Page -6-

B.   Local Civ. R. 56

Motions for summary judgment are also governed by Local Civ. R. 56. *See* Local Civ. R. 56. "Local Rule 56 is in service to Federal Rule of Civil Procedure 56." López-Hernández, 64 F.4th at 26 (*quoting* Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011)). It is an "anti-ferret rule. . .intended to protect the district court from perusing through the summary judgment record in search of disputed material facts and prevent litigants from shifting that burden onto the court." Id.

Pursuant to this rule, the non-moving party must "admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." Local Civ. R. 56(c). For facts that are denied, a non-movant's "opposing statement shall support each denial or qualification by a record citation. . ." Id. The non-moving party's opposing statement may also contain "a separate section [of] additional facts, set forth in separate numbered paragraphs and supported by record citation." Id. The moving party may then submit a reply that admits, denies, or qualifies the nonmovant's additional facts through "a separate, short, and concise statement of material facts, which shall be limited to any additional fact submitted by the opposing party" that is supported by record citation. *See* Local Civ. R. 56(d).

Civil No. 22-1402(GMM)
Page -7-

"Under Local Rule 56, a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated. . .when the statements contained in the movant's Statement of Uncontested Facts. . .are not properly controverted." López-Hernández, 64 F.4th at 26; *see also* Ramirez-Rivera 2023 WL 6168223, at *2 ("The First Circuit's repeated admonition on this issue in the last few years, places the Puerto Rico federal bar on clear notice that compliance with Local Rule 56 is a mandate, not a suggestion."). Litigants ignore Local Rule 56(c) at their peril. *See* López-Hernández, 64 F.4th at 26.

### III. UNCONTESTED FACTS

The Court examined Plaintiffs' Statement of Uncontested Facts (Docket No. 19); *Defendants' Opposing Statement of Material Facts under Local Rule 56(c) and Supplemental Statement of Uncontested Material Facts* ("Defendant's Statement of Uncontested Facts") (Docket No. 36-1); and *Dorado Gardens LLC and Dorado Park LLC's Reply in Support of their Statement of Uncontested Material Facts and Responses to Defendants' Statement of Uncontested Material Facts* (Docket No. 47-1). After crediting only material facts supported by accurate record citations, the Court finds the following facts to be uncontested:

1. Dorado Gardens is a limited liability company existing under the laws of the State of Missouri. (Docket Nos. 19 ¶ 1; 19-1; 36-1 ¶ 1; 47-1 ¶ 1).

2.  Dorado Park is a limited liability company existing under the laws of the State of Missouri. (Docket Nos. 19 ¶ 2; 19-2; 36-1 ¶ 2; 47-1 ¶ 2).

3.  Efrón is the owner in fee simple of Property A, a parcel of land located on Efrón Avenue, in the Municipality of Dorado, Puerto Rico, having an area of approximately 41,797.8572 square meters, equivalent to 10.6345 acres (*cuerdas*), recorded as Property No. 13,040 in the Registry of Property of Puerto Rico, Bayamón Section IV (the "Registry"), at page 218 of volume 255 of Dorado. (Docket Nos. 19 ¶ 3; 36-1 ¶ 3).

4.  Efrón Dorado is the owner in fee simple of Property B, a parcel of land located on Efrón Avenue and Road No. 695, in the Municipality of Dorado, Puerto Rico, having an area of approximately 112,900.0849 square meters, equivalent to 28.7249, recorded as Property No. 1,689 in the Registry at page 91 of volume 257 of Dorado. (Docket Nos. 19 ¶ 12; 36-1 ¶ 12).

5.  Plaintiffs identified Mr. José Arreseigor ("Arreseigor") as an individual who possessed the authority to serve as their representatives during the precontracting negotiations. (Docket No. 47 at 3).

6.  Alvarez Díaz & Villalón ("AD&V") is an architecture and design consulting firm based in Puerto Rico and Miami. (Docket Nos. 19 ¶ 21; 41-4).

7.  AD&V engaged in discussions with Arreseigor regarding construction on the Properties. (Docket Nos. 19 ¶ 21; 41-4).

8.  On October 15, 2019, Mr. Alejandro Cubiña Pérez, a biologist of Reforesta, Inc., ("Biologist Cubiña") prepared a Wetland Preliminary Evaluation ("preliminary wetlands evaluation") for Efrón's parcel of land. (Docket Nos. 36-1 at 36 ¶ 34; 47-1 at 45 ¶ 34).

9.  According to the preliminary wetlands evaluation, Biologist Cubiña visited the 125-acre property on August 24, 2019, and determined that "[i]t is

estimated that herbaceous wetlands cover the remaining 100.4 acres [of the property]." (Docket Nos. 36-18; 47-1 at 45 ¶ 34).

10. Biologist Cubiña concluded that "[i]f a fill permit is obtained, wetland mitigation could be done *in situ* by restoration/enhancement activities or offsite if space is limited." (Docket Nos. 36-1 at 36 ¶ 34; 36-18; 47-1 at 45 ¶ 34).

11. On March 31, 2020, Efrón sent an email to Arreseigor, providing a description and information on the Properties available for sale and disclosing the fact that the Properties needed "substantial infill." (Docket Nos. 36-1 at 26 ¶ 1; 47-1 at 33 ¶ 1).

12. In June of 2020, Biologist Cubiña completed the Wetlands Report which analyzed Efrón's 127.7338-acre parcel which included Property A and Property B. (Docket No. 19-13, 36-1 at 36 ¶ 35).

13. According to the Wetlands Report: "[f]ield information was collected at ninety-seven (97) points (Attachment X), thirty-nine (39) of them (40.21%). . .were determined to meet wetland criteria." (Docket Nos. 36-1 at 37 ¶ 36; 47-1 at 45 ¶ 36).

14. On October 2, 2020, at the request of Arreseigor, Efrón sent him a proposal for the sale of the Properties. In the proposal letter, Efrón included the following: "You estimated that you will need approximately 400,000 cubic meters of fill to raise this area to a buildable site. Assuming that you need that much, I am willing to give you a credit toward the land purchase. . .If there is any mitigation required by the federal agencies, I will provide any such mitigation up to a 2 to 1 ratio [sic] from another property in Dorado that we have access to." (Docket Nos. 36-1 at 27 ¶ 2; 36-3 at 1-2; 47-1 at 33 ¶ 2).

15. On March 31, 2021, Arreseigor sent 2 letters of intent ("LOIs") to Efrón on behalf of the Plaintiffs with the terms and conditions that they proposed for the purchase of the Properties. The

LOIs were drafted by the Plaintiffs. At this time, Arreseigor expressed: "[n]ote that these LOIs already take into account the cost of fill to comply with latest flood levels as well as costs for the wetland mitigation except for the land itself which you mentioned you will provide." (Docket Nos. 36-1 at 27 ¶ 3; 36-4; 47-1 at 33-34 ¶ 3).

16. The two LOIs sent to Efrón on March 31, 2021, contained the following provision: "Wetland Mitigation: The Seller will provide, at no cost to the Purchaser, any and all land necessary and convenient for any wetland mitigation required by any and all permitting agencies. The cost of the mitigation process shall be responsibility of the Purchaser, if and when the purchase of the Property is completed." (Docket Nos. 36-1 at 27 ¶ 4; 36-4 at 3, 13; 47-1 at 34 ¶ 4).

17. On April 26, 2021, Arreseigor sent an e-mail to Efrón in which he acknowledged that "[t]he 30-acre [Property B] lot has most of the wetland mitigation cost." (Docket Nos. 36-1 at 28 ¶ 5; 36-5; 47-1 at 34 ¶ 5).

18. On July 13, 2021, the Parties executed the LOIs for the purchase of the Properties. (Docket Nos. 36-1 at 28 ¶ 7; 36-7; 47-1 at 35 ¶ 7).

19. The LOI between Efrón and Dorado Gardens provided the following with respect to wetlands on Property A: "Wetland Mitigation: The Seller will provide, at no cost to the Purchaser, all land necessary and convenient for any wetland mitigation required by any and all permitting agencies up to a maximum of 2.5 times the size of the lot (104,035 sq.mt.). The cost of the mitigation process shall be responsibility of the Purchaser, if and when the purchase of the Property is completed." (Docket Nos. 36-1 at 28 ¶ 9; 36-7 at 4; 47-1 at 35 ¶ 8).

20. The LOI between Efrón Dorado and Dorado Park provided the following with respect to wetlands in on Property B: "Wetland Mitigation: The Seller will provide, at no cost to the Purchaser, all land necessary and convenient for any wetland mitigation required by any and all permitting agencies up to

a maximum of 2.5 times the size of the lot (300,745 sq.mt.). The cost of the mitigation process shall be responsibility of the Purchaser, if and when the purchase of the Property is completed." (Docket Nos. 36-1 at 28 ¶ 9; 36-7 at 11; 47-1 at 35-36 ¶ 9).

21. As of August 9, 2021, Plaintiffs had budgeted almost $3 million for wetland mitigation and over $5.8 million for fill work. (Docket Nos. 36-1 at 29 ¶ 11; 36-8 at 5, 7; 47-1 at 36 ¶ 11).

22. On September 13, 2021, Arreseigor asked Efrón if he had a soil study of the Properties. Efrón answered that he had a jurisdictional determination ("I have a JD"). (Docket Nos. 36-1 at 29 ¶ 12; 47-1 at 36 ¶ 12).

23. On December 23, 2021, Efrón, as seller, and Dorado Gardens, as buyer, entered into a PSA whereby Efrón agreed to sell, assign, convey, transfer, and deliver to Dorado Gardens, and Dorado Gardens agreed to purchase, accept, and assume, as of the Closing Date[1], the fee simple, insurable, marketable and recordable title to, and all of the rights, title, and interests in and to Property A held by David Efrón, free and clear of all liens and encumbrances. Property A was identified in the Property Registry as property number 13,040. (Docket Nos. 19 ¶ 5; 19-5 at 44; 36-1 ¶ 5).

24. The purchase price for Property A was to be paid in a total lump sum of $5,464,750.48, "provided however, that the Parties have agreed that if the ALTA Survey. . .shows that the total surface area

---

[1] The Closing date is defined in Section 6.1 of the PSA of Property A:

Closing Date: The Transaction contemplated herein shall be closed, at a place mutually agreed upon by the Parties, within thirty (30) days from the expiration of the Due Diligence Period, unless Buyer shall have delivered a notice to Seller stating that one or more of the conditions listed in Section 4 as a cause for termination of this Agreement shall have occurred and be continuing, and that as a result, Buyer has elected to terminate this Agreement. For purposes of this Agreement, the consummation of the transactions contemplated herein are being referred to as the "Closing" and the date of such Closing is being herein referred to as the "Closing Date". (Docket No. 19-5 at 5-6).

of the Property is less than ninety-five percent
(95%) of the area indicated in Exhibit A. . .the
Purchase Price shall be adjusted at the unitary
price of ONE HUNDRED THIRTY-FOUR DOLLARS ($134.00)
per square meter." (Docket Nos. 19 ¶ 6; 19-5 § 3;
36-1 ¶ 6).

25. The Effective Date of the PSAs was December 23,
2021. (Docket Nos. 19-5 at 1 and 19-7 at 1).

26. The term Due Diligence Period as defined in the
PSAs is the period commencing on the Effective Date
and expiring 183 days from that Effective Date.
(Docket Nos. 19-5 at 3 and 19-7 at 3).

27. As part of the Purchase Price, Dorado Gardens had
to deliver to Efrón, within three days of the
Property A PSA's Effective Date, the amount of
$109,295.00, or 2% of the Purchase Price, as an
earnest money deposit (the "Property A Deposit"),
to be placed into an escrow account with Popular
Insurance LLC (the "Escrow Holder") pursuant to the
Escrow Agreement between Parties and the Escrow
Holder. The Deposit was to become "non-refundable
upon the expiration of the Due Diligence Period
[…]and Buyer shall have no right to recover the
same in case of termination of this [PSA], except
as may by otherwise set forth in this [PSA]." The
Due Diligence Period ended 183 days from the
Effective Date. (Docket Nos. 19 ¶ 7; 19-5 § 3(a);
36-1 at 7; 47-1 ¶ 7, 9).

28. Dorado Gardens delivered the Property A Deposit to
Efrón. (Docket Nos. 19 ¶ 8; 19-6 ¶ 8; 36-1 ¶ 8).

29. Section 2(b) of the Property A PSA provides that
Dorado Gardens agreed to purchase Property A on an
"as is" basis and acknowledged that it was
executing the [PSA]: "with the intention of making
and relying upon its own investigation of the
physical, environmental, economic use, compliance
and legal condition of the Property (as discussed
and detailed herein); (2) EXCEPT FOR THE
REPRESENTATION AND WARRANTIES EXPRESSLY MADE BY
Seller herein as to title, Buyer is not now relying,
and shall not later rely upon any representations
and warranties made by Seller or anyone acting or

claiming to act on Seller's behalf concerning the Property; and (3) Buyer has thoroughly inspected or will thoroughly inspect the Property and, by not terminating the [PSA] pursuant to explicit terms hereof, shall have found the Property in complete satisfaction." (Docket No. 19-5 § 2(b); 36 at 16; 36-1 at 2-3).

30. Section 4 of the Property A PSA, that pertains to the Due Diligence Period, provides that "[p]rior to the execution date thereof, Seller delivered and/or made available to Buyer, copies of all available documents and/or information in Seller's possession, to facilitate Buyer's due diligence review of the Property (collectively, the "Due Diligence Material"). Seller, however, shall have no liability with regard to the content of such Due Diligence Material and shall not be required to update the Due Diligence Material (but will provide a copy of any update to the Due Diligence Material that is made by Seller during the Due Diligence Period, as defined herein below). While Seller will cooperate with Buyer, the responsibility for carrying out the due diligence rests solely with Buyer, who will bear all costs and undertake all efforts necessary to complete the due diligence." (Docket Nos. 19 ¶ 10; 19-5 § 4 ¶ 1; 36-1 at 10).

31. Section 4 of the Property A PSA provides that after the commencement of the Property A Due Diligence Period: "Buyer may only terminate this [PSA] under this Section for at least one of the following: (A) the ALTA Survey reflects a land area which is less than ninety-five percent (95%) of the area stated in Exhibit A hereto (i.e. less than 107,255.0807 square meters) and, as such, would make the Property unsuitable for the intended use of Buyer, (B) environmental, infrastructure, permitting and/or lack of access issues with the Property that would preclude the intended use of Buyer as stated herein. . .If the [PSA] is terminated under this paragraph and notice of such termination is delivered to Seller before the expiration of the Due Diligence Period, Seller will instruct the Escrow Holder to immediately return the total amount of Deposit to Buyer." (Docket Nos. 19-5 § 4 ¶ 3; 36 at 14-15).

32. Section 3(a) of the Property A PSA provides: "[t]he Deposit shall become non-refundable upon the expiration of the Due Diligence Period. . .and Buyer shall have no right to recover the same in case of termination of this [PSA], except as may be otherwise set forth in this [PSA]." (Docket Nos. 19-5 §3(a) and 36-1 at 5 ¶ 9).

33. The Property A Deposit was to become non-refundable upon the expiration of the due diligence period (the "Property A Due Diligence Period"), set to expire 183 days from the Effective Date of the Property A PSA, that is, on June 24, 2022. (Docket Nos. 19 ¶ 9; 19-5 § 3(a) ¶ 2; 36-1 ¶ 9).

34. Section 8 (a)(xvii)of the Property A PSA provides: "Seller, as a material inducement for Buyer to enter into this [PSA], represents, warrants and covenants to Buyer as of the Effective Date, and as of the Closing Date, that:…The Due Diligence Material delivered by Seller to Buyer is, or upon its delivery will be, complete and accurate copies of the Due Diligence Material in Seller's files." (Docket No. 19-5 § 8(a)(xvii); 36-1 ¶ 11).

35. Section 15(t) of the Property A PSA provides: "If Buyer shall at any time be entitled to receive reimbursement of the Deposit in accordance with any of the terms and conditions of this [PSA], the Parties covenant and agree to execute and deliver to Escrow Holder a joint notice instructing the Escrow Holder to return such Deposit to Buyer on or before thirty (30) business days form the date that Buyer requests the reimbursement as per the terms hereof." (Docket Nos. 19 ¶ 40; 19-5 § 15(t); 36-1 ¶ 40).

36. On December 23, 2021, Efrón Dorado, as seller, and Dorado Park, as buyer, entered into a PSA (the "Property B PSA") whereby Efrón Dorado agreed to sell, assign, convey, transfer, and deliver to Dorado Park, and Dorado Park agreed to purchase, accept, and assume, as of the Closing Date (as defined therein), the fee simple, insurable, marketable, and recordable title to, and all of the rights, title and interests in and to Property B held by Efrón Dorado, free and clear of all liens

and encumbrances. Property B was identified in the Property Registry as property number 1,689. (Docket Nos. 19 ¶ 14; 19-7; 36-1 ¶ 14; 19-7 at 44).

37. The purchase price for Property B was to be paid in a total lump sum of $12,024,988.10, "provided however, that the Parties have agreed that if the ALTA Survey. . .shows that the total surface area of the Property is less than ninety-five percent (95%) of the area indicated in Exhibit A…the Purchase Price shall be adjusted at the unitary price of ONE HUNDRED TWO DOLLARS ($102.00) per square meter (the "*Survey Adjustment*"); and (ii) if the US Army Corps of Engineers or any other permitting agencies with jurisdiction over the Property Require wetland mitigation, the Purchase Price shall be adjusted at the unitary price of THREE THOUSAND DOLLARS ($3,000) per cuerda for up to a maximum of the lesser of (x) two point five (2.5) times the size of the Property or (y) seventy-five (75)cuerdas (equivalent to 294,779.67 square meters) (the "*Mitigation Adjustment*"). Seller shall be part of the negotiation process for the mitigation and all terms and conditions thereof must be reasonably acceptable to Seller. The cost of the mitigation process shall be the sole responsibility of the Buyer, if, and when, the Closing of the Property is completed." (Docket Nos. 19 ¶ 15; 19-7 § 3; 36-1 ¶ 15).

38. As part of the purchase price, Dorado Park was obliged to deliver to Efrón Dorado, within three business days of the Effective Date, the amount of $245,400.00, or 2% of the Property B Purchase Price, as an earnest money deposit (the "Property B Deposit", collectively with the Property A Deposit, the "Deposits"), to be placed into an escrow account with the Escrow Holder pursuant to that certain Escrow Agreement signed by the Parties and the Escrow Holder on even date herewith.(Docket Nos. 19 ¶ 16; 19-7 § 3(a); 36-1 at 16).

39. Dorado Park delivered the Property B Deposit to Efrón Dorado. (Docket Nos. 19 ¶ 17; 36-1 ¶ 17).

40. Pursuant to Section 2(b) of the Property B PSA, Dorado Park agreed to purchase the property on an

"as is" basis and acknowledged that it was executing the [PSA] "with the intention of making and relying upon its own investigation of the physical, environmental, economic use, compliance and legal condition of the Property (as discussed and detailed herein); (2) EXCEPT FOR THE REPRESENTATION AND WARRANTIES EXPRESSLY MADE BY Seller herein as to title, Buyer is not now relying, and shall not later rely upon any representations and warranties made by Seller or anyone acting or claiming to act on Seller's behalf concerning the Property; and (3) Buyer has thoroughly inspected or will thoroughly inspect the Property and, by not terminating the [PSA] pursuant to explicit terms hereof, shall have found the Property in complete satisfaction." (Docket No. 19-7 § 2(b); 36 at 16; 36-1 ¶ 17).

41.   Section 4 of the Property B PSA provides that "[p]rior to the execution date thereof, Seller delivered and/or made available to Buyer, copies of all available documents and/or information in Seller's possession, to facilitate Buyer's due diligence review of the Property (collectively, the "Due Diligence Material"). Seller, however, shall have no liability with regard to the content of such Due Diligence Material and shall not be required to update the Due Diligence Material (but will provide a copy of any update to the Due Diligence Material that is made by Seller during the Due Diligence Period, as defined herein below). While Seller will cooperate with Buyer, the responsibility for carrying out the due diligence rests solely with Buyer, who will bear all costs and undertake all efforts necessary to complete the due diligence." (Docket Nos. 19 ¶ 19; 19-7 § 4 ¶ 1; 36-1 ¶ 19).

42.   Section 4 of the Property B PSA also provides: "Buyer may only terminate this [PSA] under this Section for at least one of the following: (A) the ALTA Survey reflects a land area which is less than ninety-five percent (95%) of the area stated in Exhibit A hereto (i.e. less than 107,255.0807 square meters) and, as such, would make the Property unsuitable for the intended use of the Buyer; (B) environmental, infrastructure,

permitting and/or lack of access issues with the Property that would preclude the intended use of Buyer as stated herein. . .If the [PSA] is terminated under this paragraph and notice of such termination is delivered to Seller before the expiration of the Due Diligence Period, Seller will instruct the Escrow Holder to immediately return the total amount of Deposit to Buyer." (Docket No. 19- 7 § 4 ¶ 3; 36 at 14-15).

43. Pursuant to Section 3(a) of the Property B PSA: "[t]he Deposit shall become non-refundable upon the expiration of the Due Diligence Period and Buyer shall have no right to recover the same in case of termination of this [PSA], except as may be otherwise set forth in this [PSA]." Accordingly, the Property B Deposit was to become non-refundable upon the expiration of the due diligence period (the "Property B Due Diligence Period", collectively with Property A Due Diligence Period, the "Due Diligence Periods"), set to expire on the 183 days from the Effective Date of the Property B PSA, that is, on June 24, 2022.(Docket Nos. 19 ¶ 18; 19-7 § 4; 36-1 ¶ 18).

44. Section 8 (a)(xvii)of the Property B PSA provides: "Seller, as a material inducement for Buyer to enter into this [PSA], represents, warrants and covenants to Buyer as of the Effective Date, and as of the Closing Date, that:. . .The Due Diligence Material delivered by Seller to Buyer is, or upon its delivery will be, complete and accurate copies of the Due Diligence Material in Seller's files.." (Docket No. 19-7 § 8(a)(xvii)).

45. Section 15(t) of the Property B PSA, which deals with the reimbursement of the Property B Deposit, specifically provides "If Buyer shall at any time be entitled to receive the reimbursement of the Deposit in accordance with any of the terms and conditions of this [PSA], the Parties covenant and agree to execute and deliver to Escrow Holder a joint notice instructing the Escrow holder to return such Deposit to Buyer on or before thirty (30) business days from the date that Buyer requests the reimbursement as per the terms

hereof." (Docket Nos. 19 ¶ 41; 19-7 ¶ 15(t); 36-1 ¶ 40).

46. In the Property B PSA, Efrón Dorado represented, warranted, and covenanted as of the Effective Date and as of the Closing Date of the Property B PSA that the Property B Due Diligence Material delivered to Dorado Park is, or upon its delivery would be, complete and accurate copies of the Due Diligence Material in Efrón Dorado's files. (Docket Nos. 19 ¶ 20; 19-7 ¶ 8 (xvii); 36-1 at 10-11 ¶ 20).

47. The PSA between Efrón Dorado and Dorado Park contemplated, and Dorado Park was aware of, the presence of wetlands in the subject property and the possibility that a government agency could require wetland mitigation. (Docket Nos. 36-1 at 32 ¶ 19; 47-1 at 40 ¶ 19).

48. The Parties agreed that, if the transactions were not closed due to Dorado Park's or Dorado Gardens' default or failure to comply with any of the terms of the PSAs, Efrón Dorado and Efrón had the option of either: (a) terminating the [PSA], in which event Dorado Park and Dorado Gardens would have forfeited the deposits to Efrón Dorado and Efrón, and they would have had the right to recover damages from Dorado Park and Dorado Gardens; or (b) compel specific performance of Dorado Park's and Dorado Garden's obligations under the PSAs. (Docket Nos. 36-1 at 33 ¶ 24; 47-1 at 42 ¶ 24).

49. On December 23, 2021, the Parties also executed two Escrow Agreements with Popular Insurance, which were amended on February 1, 2022. With respect to the possibility of the Parties failing to close the transactions and the delivery of the deposits, Section 9.2 stated:

Notwithstanding anything herein contained to the contrary, if PURCHASER (i) causes any scheduling delays resulting in the late payment of any amounts due under the [PSA] or (ii) fails to close this transaction for reasons other than SELLER's default or any of the exceptions expressly contained in the [PSA] and, after notice by SELLER and the applicable cure periods of PU[R]CHASER have

elapsed, SELLER decides to terminate the [PSA], SELLER shall deliver written notice of termination to PURCHASER and ESCROW AGENT. Within three (3) business days of the receipt of SELLER's notice of termination, ESCROW AGENT shall surrender and deliver the Escrow Deposit in full to SELLER. (Docket Nos. 36-1 at 34 ¶ 26; 36-11; 36-12; 47-1 at 43 ¶ 26).

50. On March 15, 2022, Efrón sent an email to Arreseigor requesting his partners' emails to send them additional documents that he located in relation to the Properties. (Docket Nos. 36-1 at 38 ¶ 38; 36-19; 47-1 at 46 ¶ 38).

51. Defendants had knowledge and received a copy of the Wetlands Report before entering into the PSAs. (Docket Nos. 19 ¶ 28; 19-6 ¶¶ 1-4; 36-1 ¶ 28).

52. On March 16, 2022, Efrón sent an email to Arreseigor and his partners attaching the site plan, permits and endorsements (including from the US Army Corps of Engineers) for a prior proposed development in Property A. Efrón, also advised that he would send, under separate cover, a copy of the Wetlands Report. (Docket Nos. 36-1 at 58 ¶ 39; 36-20; 47-1 at 46-47 ¶ 39).

53. On March 17, 2022, 85 days after the commencement of the Due Diligence Period, Efrón delivered to Plaintiffs the Wetlands Report. (Docket Nos. 19 ¶ 27; 19-12; 36-1 ¶ 27; 47-1 at 17-18 ¶ 27).

54. On March 30, 2022, Efrón asked Arreseigor if Plaintiffs were still interested in the Properties, as Plaintiffs had not picked up from his office a binder with documents related to a hydrologic study that had been performed. Arreseigor responded that Plaintiffs had the intention of exercising the purchase option. (Docket Nos. 36-1 at 35 ¶ 32; 47-1 at 44 ¶ 32).

55. On June 23, 2022, that is, within the Due Diligence Period under the Property A PSA, Dorado Gardens sent that certain Notice of Termination (the "Property A Notice of Termination") to Efrón, as seller. The reason given for the termination was

that: "On April 5, 2022 the Seller made available
to the Buyer for the first time during the Due
Diligence Period a wetlands' determination,
analysis and delineation report for the Property
prepared by [Biologist] Cubiña and Laredo González,
dated June, 2020. . .which Seller informed Buyer
was submitted for evaluation to the U.S. Army Corps
of Engineers during the 2021 year, approximately
sixty-five percent (65%) of the Property meets the
wetlands criteria and consequently renders the
Property unsuitable for Buyer's intended use."
(Docket Nos. 19 ¶ 35; 19-18; 36-1 ¶ 35; 36-1 at 34
¶ 35).

56. On June 23, 2022, that is, within the Due Diligence
Period under the Property B PSA, Dorado Park sent
certain Notice of Termination (the "Property B
Notice of Termination") to Efrón Dorado, as seller.
The reason given for the termination was that "On
April 5, 2022 the Seller made available to the Buyer
for the first time during the Due Diligence Period
a wetlands' determination, analysis and delineation
report for the Property prepared by [Biologist]
Cubiña and Laredo González, dated June, 2020
(hereinafter, the "Report"), which Seller informed
Buyer was submitted for evaluation to the U.S. Army
Corps of Engineers during the 2021 year,
approximately sixty-five percent (65%) of the
Property meets the wetlands criteria and
consequently renders the Property unsuitable for
Buyer's intended use." (Docket Nos. 19 ¶ 36; 19-
19; 36-1 at 34 ¶ 36).

57. As part of the Property A Notice of Termination,
Dorado Gardens requested that Efrón instruct the
Escrow Holder to immediately return the total
amount of the Property A Deposit to Dorado Gardens
following the receipt of the Property A Notice of
Termination. (Docket Nos. 19 ¶ 38; 19-18; 36-1 at
24 ¶ 38).

58. As part of the Property B Notice of Termination,
Dorado Park requested that Efrón Dorado instruct
the Escrow Holder to immediately return the total
amount of the Property B Deposit to Dorado Park
following the receipt of the Property B Notice of

Termination. (Docket Nos. 19 ¶ 39; 19-19; 36-1 at 24 ¶ 39).

59. Defendants did not instruct the Escrow Holder to return the Deposits to Plaintiffs. (Docket Nos. 19 ¶ 42; 36-1 at 26 ¶ 42).

60. On July 22, 2022, Efrón Dorado and Efrón notified Dorado Park and Dorado Gardens that the reason for the termination of the PSAs as stated in their letters is not covered by Section 4 of the agreements and, therefore, the deposits belonged to Defendants. (Docket Nos. 36-1 at 35 ¶ 28; 36-13; 36-14; 47-1 at 43 ¶ 28).

## IV. APPLICABLE LAW AND DISCUSSION

After identifying the findings of fact, the Court next addresses the Plaintiffs' causes of action. As a preliminary matter, the Court finds it instructive to provide a summarized timeline of the key events in this case.

- October 15, 2019 - A preliminary wetlands evaluation was prepared for Efrón's parcel of land

- March 31, 2020 - Efrón sent Arreseigor an email regarding a description of the Properties

- June, 2020 - Biologist Cubiña completed the Wetlands Report

- October 2, 2020 - Arreseigor asked Efrón to send him a proposal for the sale of the Properties

- March 31, 2021 – Arreseigor sent Efrón two LOIs containing proposed terms and conditions for the purchase of the Properties

- July 13,2021 - Parties executed the LOIs for the purchase of the Properties

Civil No. 22-1402(GMM)
Page -22-

- September 13,2021- Arreseigor asked Efrón if he had
  a soil study for the Properties and Efrón answered
  that he had the Wetlands Report

- December 23, 2021 – The PSAs for the Properties
  were executed

- March 17,2022 – Efrón delivered the Wetlands Report
  to Plaintiffs

- June 23,2022 - Plaintiffs sent notices of
  termination for both, the Property A PSA and the
  Property B PSA

- June 24, 2022 – The Due Diligence Periods for the
  Properties ended

- July 22, 2022 – Defendants informed Plaintiffs that
  their reason for termination did not fall within
  the scope of Section 4 of both PSAs and thus,
  Plaintiffs were not entitled to a return of their
  deposit

Defendants posit that the authenticity of the Wetlands Report is in dispute. (Docket No. 36 at 4). Specifically, Defendants contend that the Wetlands Report filed at Docket Nos. 19-13, 19-14, 19-15, and 19-16 were inadequately authenticated through the attachment of "an unsworn statement under penalty of perjury by [Arreseigor], identified as 'authorized representative of the Plaintiffs' but with no official title or evident authority, certifying that exhibits 8, 9, 13, and 14 of the Statement of Uncontested Facts attached to the Plaintiffs' Motion for Summary Judgment 'are true and exact copies of the documents that I personally received.'" Id. "Documents supporting or opposing summary judgment must be properly authenticated." Carmona v.

Toledo, 215 F.3d 124, 131 (1st Cir. 2000) (*citing* Fed. R. Civ. P. 56(e)). Thus, prior to addressing Plaintiffs' arguments, the Court first addresses whether the Wetlands Report was properly authenticated making it admissible for consideration on summary judgment.

Rule 901 of the Federal Rules of Evidence provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Joseph v. Lincare, Inc., 989 F.3d 147, 156 (1st Cir. 2021) (*citing* Fed. R. Evid. 901(a)). A document can be authenticated by the testimony of a witness with knowledge that an item is what it is claimed to be. *See* Fed. R. Evid. 901(b)(1). "For documents to be admissible during the summary judgment stage, these must be authenticated by and attached to an affidavit or unsworn statement under penalty of perjury that meets the requirements of Federal Rule of Civil Procedure 56(e)." Rojas-Ramirez v. BMJ Foods, Inc., Civ. No. 09-1593 (GAG), 2011 WL 693621, at *5 (D.P.R. Feb. 24, 2011) (*citing* Mercado v. Hospital Cayetano Coll Y Toste, 2010 WL 3419969 at *7 n.2 (D.P.R. Aug. 26, 2010))(emphasis supplied); *see also* Carmona, 215 F.3d at 131; 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2722 (3d ed. 1998).

Civil No. 22-1402(GMM)
Page -24-

"The authentication requirement is rarely onerous; in many instances, a single sentence will suffice, indicating that the document is what it appears to be." Rojas-Ramirez, 2011 WL 693621, at *5 *(quoting* Goguen ex rel. Estate of Goguen v. Textron, Inc.*,* 234 F.R.D. 13, 17 (D.Mass.2006)). Plaintiffs submitted with their Motion for Summary Judgment an *Unsworn Statement under Penalty of Perjury Pursuant to 28 U.S.C. § 1746*, in which Arreseigor certified the exhibits containing the June 2020 Wetlands Report. (Docket No. 19-10). The authentication standard is whether the certifying individual had knowledge that an item is what it is claimed to be and thus, Defendants' argument that Arreseigor lacked authority to act on Plaintiffs' behalf is inconsequential to determining the Wetlands Report's authenticity. The Court finds that the undisputed record demonstrates that Arreseigor received the emails containing the Wetlands Report on behalf of Plaintiffs, indicating that he possessed the requisite personal knowledge. (Docket Nos. 19-12; 36-1 at 14 ¶ 27). Moreover, in Defendants' Statement of Uncontested Facts, they cite the Wetlands Report filed by Plaintiffs and characterize it as the June 2020 Wetlands Report completed by Biologist Cubiña. (Docket No. 36-1 at 36 ¶ 35). Thus, the Court finds the Wetlands Report was adequately authenticated for its consideration in ruling on Plaintiff's' Motion for Summary Judgment.

Next, the Court acknowledges that this case comes before it under diversity jurisdiction. Accordingly, the Court applies the substantive law of Puerto Rico. *See* Rivera-Marrero v. Presbyterian Cmty. Hosp., Inc., Civ. No. 14-1922 (DRD), 2016 WL 7670044, at *1 (D.P.R. Dec. 5, 2016) (*quoting* Summers v. Fin. Freedom Acquisition LLC, 807 F.3d 351, 354 (1st Cir. 2015)). Moreover, Plaintiffs bring their claims under the 2020 Puerto Rico Civil Code which has not been widely cited in available case law. However, the jurisprudence regarding *dolo* and contract formation have not significantly changed with the passage of the new code and thus, the Court cites case law arising under the previous civil code.

A.   *Dolo Grave*

Under Puerto Rico law, "*dolo*," may exist "either in the formation of a contract where a party obtains the consent of another through deceptive means, or in the performance of a contractual obligation where a party knowingly and intentionally, through deceitful means, avoids complying with its contractual obligations." Carrero v. Molina Healthcare of P.R., Inc., 602 F.Supp.3d 310, 313 (D.P.R. 2022) (*citing* Feliciano-Muñoz v. Rebarber-Ocasio, 970 F.3d 53, 62 (1st Cir. 2020)). Pursuant to 31 L.P.R.A. § 6211, 'dolo grave' or serious fraud "consists of an intentional action or omission through which the party or a third party induces another party to enter into a legal transaction that they otherwise would not have entered into. If the action or

omission does not cause the legal transaction to be entered into, the injured party may claim any damage incurred." In short, *Dolo grave* is that which impacts the consent of a contracting party. *See* Andino-Oquendo v. Federal National Mortgage Association, Civ. No. 18-1772 (RAM), 2023 WL 2245072, at *4 (D.P.R. Feb. 27, 2023) (*quoting* Feliciano-Muñoz, 970 F.3d at 62).

*Dolo grave* functions to nullify a contract. *See* Carrero, 602 F.Supp.3d at 313. "[A] plaintiff must sufficiently plead that the defendant acted with intentional fault or bad faith to deceive him when discussing the formation of an agreement between the parties." Id. (internal quotation marks and citations omitted); *see also* Burk v. Paulen, 100 F.Supp.3d 126, 135 (D.P.R. 2015) ("[T]he party alleging *dolo* bears the burden of proof."); Sacarello v. Am. Airlines, Inc., 2022 U.S. Dist. LEXIS 148176, *12 (D.P.R. 2022).

The crux of Plaintiffs' *dolo grave* argument is that Defendants withheld the Properties' Wetlands Report during the pre-contractual stage of negotiations and for over 80 days of the Due Diligence Period. Plaintiffs allege that had they possessed the Wetlands Report they would not have entered into the PSAs since the prevalence of wetlands would have made the Properties unsuitable for their planned purpose. Thus, Plaintiffs contend that the alleged withholding of the Wetlands Report vitiated Plaintiffs' consent and nullified the PSAs. Conversely, Defendants argue that Plaintiffs were aware of the presence of wetlands on

the Properties and had budgeted millions of dollars towards wetland mitigation and fill work.

> Plaintiffs stress that:

> While Plaintiffs were aware that maybe there was some mitigation of wetlands to be made, and that the PSAs had a provision to mitigate parts of wetlands, the PSAs did not contemplate that the majority of the [P]roperties at issue were considered wetlands. Simply put, mitigation would be to reduce the impact of wetlands in the [P]roperties at issue, not to convert a wetland into a property that could then be developed.

(Docket No. 47 at 6). Plaintiffs further contend that had they known that 65% of the Properties qualified as wetlands, as was supposedly stated in the Wetlands Report, they would not have agreed to purchase the Properties.

Viewing the facts in the light favorable to the non-moving party, here Defendants, the Court cannot find that Defendants engaged in *dolo grave* when they did not submit the Wetlands Report to Plaintiffs prior to the execution of the PSAs. Evidence and Plaintiffs own admissions demonstrate that Plaintiffs knew that significant land filling and wetland mitigation actions would be necessary for the construction of their planned development. As early as March of 2020, 20 months before Plaintiffs entered the PSAs, the Properties were characterized to Plaintiffs' representative, Arreseigor, as requiring "substantial infill." The Parties to the PSAs negotiated around the wetlands mitigation and infill requirements by, for instance, considering land purchase

credits in light of necessary wetland mitigation actions that the Buyers would need to undertake. The record also indicates that prior to entering the PSAs, Plaintiffs purported representative, Arreseigor, knew Defendants possessed the Wetlands Report. Plaintiffs nevertheless signed the PSAs knowing of the wetlands on the Properties and without reviewing the Wetlands Report, despite being aware of said report's existence.

The Court is skeptical that the contents of the Wetlands Report indicated that the Properties were unsuitable for Plaintiff's intended use and would have certainly altered Plaintiffs' decision to enter into the two PSAs. Specifically, the June 2020 Wetlands Report by Biologist Cubiña evaluated a 127.7338 acre parcel of land that included Property A and Property B. (Docket No. 19-13 at 4). The Wetlands Report evaluation was completed through the collection of field information:

> at ninety seven (97) points (Attachment X), thirty nine (39) of them (40.21%), including one (1) pond and five (5) open earth channels, were determine to meet wetland criteria. In addition, the site's portions covered by herbaceous vegetation in lower areas. . .were also considered to meet wetland criteria. In total those areas comprised 83.14 acres (65%). The remaining parts of the site sum 44.59 acres (34.91%) were considered upland areas.

(Id. at 10). The Wetlands Report included a point-by-point breakdown of Biologist Cubiña's wetland determination at each of the 97 surveyed points. It also included satellite images; various maps; and photos of vegetation and soil composition on the

evaluated parcel of land. (Docket Nos. 19-14; 19-15; 19-16). Thus, the Court finds that the Wetlands Report does not <u>clearly</u> indicate the <u>distinct</u> wetlands makeup of the <u>Properties</u>, independent of the larger parcel. Thus, the Court cannot conclude that there is no material factual dispute as to whether Plaintiffs' course of action would have changed had they known that the Properties possessed more wetlands than Plaintiffs originally anticipated. The Court thus concludes that granting Plaintiffs' Motion for Summary Judgment on its claim of *dolo grave* would be inappropriate.

B.   <u>Reimbursement of Expenditures</u>

Pursuant to 31 L.P.R.A. § 9882(d) an (f), Plaintiffs' second claim requests reimbursement of expenditures and expenses they incurred because of Defendant's alleged *dolo* or *dolo grave*. (Docket No. 1 ¶ 62). The Court has already determined that it cannot find that Plaintiff's *dolo grave* claims are sufficient to succeed at the summary judgment stage. Thus, the Court now need only consider whether Plaintiffs demonstrated that there is no issue of genuine fact as to whether Defendants engaged in *dolo*. Only if the Court finds that defendants unquestionably committed *dolo* can it award Plaintiff summary judgment on its 31 L.P.R.A. § 9882 argument for reimbursement of expenditures.

Incidental *dolo*, *dolo* that does not constitute *dolo grave* or serious fraud, can create a reimbursement cause of action. *see* <u>DePool Figueroa v. Andreu Fuentes</u>, Civ. No. 16-1070 (JAG), 2017

U.S. Dist. LEXIS 231117, at *8 (D.P.R. Jan. 20, 2017) (*quoting*

P.C.M.E. Commercial, S.E. v. Pace Membership Warehouse, Inc., 952

F.Supp. 84, 92 (1997) ("In contrast [to *dolo grave*], if the "*dolo*"

only acted to influence, but was not determinative of the consent,

then this "incidental *dolo*" will only give rise to a claim for

damages."); *see also* Burk, 100 F.Supp.3d at 134; Feliciano-Muñoz,

970 F.3d at 62 (restating that a claim of incidental *dolo* can

nevertheless give "rise to a claim for damages."). Thus, the Court

considers whether Plaintiffs have adequately established that

Defendants engaged in incidental pre-contractual *dolo* that

obligates them to reimburse Plaintiffs' incurred expenses.

Under Puerto Rico law, "[m]isconduct (*dolus*) consists of

deliberate and bad faith breach with regards to the obligation.

Liability arising from misconduct (*dolus*) is enforceable for all

obligations. Waiver of a cause of action to enforce it is null and

void." 31 L.P.R.A. § 9316; (Docket No. 45-6); *see also* Punta Lima,

LLC v. Punta Lima Dev. Co., LLC, 425 F.Supp.3d 87, 106 (D.P.R.

2019) (*citing* Casco, Inc. v. John Deere Constr. & Forestry Co.,

Civ. No. 13-1325, 2015 WL 4132278, at *2 (D.P.R. July 8, 2015))

("Dolus in the performance of a contractual obligation occurs where

a party, knowingly and intentionally, through deceitful means,

avoids complying with its contractual obligation."). Moreover, a

seller's obligations include "[g]uaranteeing to the buyer that the

item sold has the promised qualities and that it is free from

defects that reduce or destroy its value or its suitability for ordinary or agreed-upon use. This does not include an insignificant reduction in value or suitability." 31 L.P.R.A. § 9991 (translated into English at Docket No. 45-7); *see also* 31 L.P.R.A. § 9882 (translated into English at Docket No. 45-5) (providing that incurring in misconduct (*Dolus*) or violence violates a Party's precontractual duties).

Plaintiffs argue that Defendants knowingly engaged in *dolus* or incidental *dolo* by withholding the Wetlands Report in their possession and failing to include it in the due diligence materials that Sellers were required to deliver pursuant to Section 8 of both PSAs. (Docket No. 1 at 17-18). Sections 8(a)(xvii) of both PSAs state:

> Seller, as a material inducement for Buyer to enter into this Agreement, represents, warrants and covenants to Buyer as of the Effective Date, and as of the Closing Date, that:
>
> . . .The Due Diligence Material delivered by Seller to Buyer is, or upon its delivery <u>will be, complete and accurate</u> copies of the Due Diligence Material in Seller's files.

(Docket Nos. 19-5 § 8(a)(xvii); 19-7 § 8(a)(xvii)) (emphasis supplied).

Conversely, Defendants note that Section 4 of the PSAs relieves them of liability for the contents of the Due Diligence materials, providing:

> Seller delivered and/or made available to Buyer, copies of all available documents and/or information in

Civil No. 22-1402(GMM)
Page -32-

> Seller's possession, to facilitate Buyer's due diligence
> review of the Property (collectively, the "Due Diligence
> Material"). Seller, however, shall have no liability
> with regard to the content of such Due Diligence Material
> and shall not be required to update the Due Diligence
> Material (but will provide a copy of any update to the
> Due Diligence Material that is made by Seller during the
> Due Diligence Period, as defined herein below). While
> Seller will cooperate with Buyer, the responsibility for
> carrying out the due diligence rests solely with Buyer,
> who will bear all costs and undertake all efforts
> necessary to complete the due diligence.

(Docket Nos. 19 ¶ 10; 19-5 § 4 ¶ 1; 19 ¶ 19; 19-7 § 4 ¶ 1; 36-1 ¶ 19; 36-1 at 10) (emphasis supplied). As such, Defendants argue that they were not liable for the inclusion of the Wetlands Report in the Due Diligence Materials and that their subsequent supplementation of the Materials with the Wetlands Report within the Due Diligence Period was in accord with their obligations under the PSAs.

The First Circuit and the Puerto Rico Supreme Court have repeatedly stated that "a party alleging *dolo* could meet its burden only with evidence that is 'solid,' 'clear and convincing,' and 'unquestionable.'" Portugues-Santana v. Rekomdiv Int'l, 657 F.3d 56, 60-61 (1st Cir. 2011) (*citing* Texas Co. (P.R.) Inc. v. Estrada*,* 50 P.R.R. 709, 713-14, 50 D.P.R. 743 (P.R.1936)); *see also* Monclova v. Financial Credit Corp.*,* 83 P.R.R. 742, 747-48, 83 D.P.R. 770 (P.R.1961).

"*Dolo*. . .may not be presumed, and the party alleging *dolo* bears the burden of proof and must demonstrate the intentional

fault or bad faith of the person to whom it is imputed." Feliciano-
Muñoz, 970 F.3d at 63 (internal quotations and citations omitted);
*see also* Burk, 100 F.Supp.3d at 135, Pace Membership Warehouse,
Inc., 952 F.Supp. at 92; Miranda Soto v. Mena Eró, 109 D.P.R. 473,
9 P.R. Offic. Trans. 628, 634 (1980).

Weighing inferences in the non-movant's favor, Plaintiffs
still fail to meet their burden in showing that Defendants
unquestionably incurred in *dolo*. Based on the uncontested facts
and the evidence on record, the Court is unconvinced that
Defendants acted with the intent necessary to support a *dolo* claim.
Defendants cooperated with Plaintiffs by providing them with the
requested Wetlands Report more than 100 days prior to the
expiration of the Due Diligence Period. Defendants never even
denied that the Report was in their possession. In fact,
Plaintiffs, through Arreseigor, knew Defendants possessed the
Wetlands Report prior to enacting the PSAs.

The Court finds there to be a genuine dispute of material
fact as to whether Defendants intentionally concealed or withheld
the Wetlands Report from Plaintiffs in bad faith. Thus, summary
judgment on Plaintiffs' *dolo* contentions would be inappropriate at
this juncture. Given that Plaintiffs' reimbursement of
expenditures cause of action requires a finding of *dolo* or *dolo
grave*, the Court must deny summary judgment on this claim.

C.   Indemnification

Plaintiffs' third claim alleges that pursuant to 31 L.P.R.A. § 9303, Defendants' failure to perform their obligations under the contract requires them to indemnify the damages caused. 31 L.P.R.A. § 9303 provides that "[a] person who in any way violates the tenor of his or her obligation shall be liable for compensation as to any damage." 31 L.P.R.A. § 9303 (Translated into English at Docket No. 45-8).

Under Puerto Rico law, indemnification can be proper as an accessory remedy "where the contractual obligations are mutual and reciprocal." Holsum de Puerto Rico, Inc. v. Compass Indus. Grp. LLC, Civ. No. 18-02004 (JAW), 2022 WL 5168741, at *4 (D.P.R. Oct. 5, 2022) (internal citations omitted). However, "[p]roviding indemnity for a damage is not inexorably linked to the breach of a contract. . . .it must also be proved that the damage that would have been sustained by those seeking performance of the contract actually exists." Constructora Bauza, Inc. v. Garcia Lopez, 129 D.P.R. 579, --- P.R. Offic. Trans. --- (1991); see also Rutledge v. Gill, 78, D.P.R. 698, 78 P.R.R. 665, 679 (1955) ("It is a well-settled legal doctrine that the mere nonperformance of contractual obligations does not entail compensation for damages pursuant to [article 1077], but that it is essential to justify their reality and the direct relation in its case with the fact giving rise to them."); Dopp v. HTP Corp., 947 F.2d 506, 511 (1st Cir. 1991)

("Nonetheless, accessory damages are not an automatic entitlement; it is the plaintiff's burden to prove them.")

Plaintiffs aver that because they would not have entered the PSAs had Defendants performed their obligation to deliver the Wetlands Report prior to the execution of the PSAs, Defendants were thus "obliged to reimburse to the Plaintiffs the full amount of the Expenditures incurred by them in connection with the Project. . .in an amount not less than $680.238.86." (Docket No. 20 at 21).

As indicated, at this stage, the Court cannot conclude that Plaintiffs would not have entered into the PSAs had they been provided the Wetlands Report at an earlier stage. Analogously, the Court finds that there are genuine issues of material fact as to whether Plaintiffs suffered any damages arising from alleged Defendants breach of contract. Thus, granting summary judgment on Plaintiffs' indemnity cause of action under 31 L.P.R.A. § 9303 would be improper.

D.   <u>Specific Performance</u>

Finally, Plaintiffs request that the Court grant them summary judgment and order Defendants to instruct the Escrow Holder to immediately return Plaintiffs their deposits for the Properties pursuant to Sections 15(t) of the PSAs. Defendants counter that, per other terms of the PSAs, Plaintiffs were not entitled to

Civil No. 22-1402(GMM)
Page -36-

terminate the Agreements and consequently, were not entitled to recover their deposits.

Section 15(t) of both PSAs state that

> If Buyer shall at any time be entitled to receive the reimbursement of the Deposit <u>in accordance with any of the terms and conditions of this Agreement</u> [PSA], the Parties covenant and agree to execute and deliver to Escrow Holder a joint notice instructing the Escrow holder to return such Deposit to Buyer on or before thirty (30) business days from the date that Buyer requests the reimbursement as per the terms hereof.

(Docket Nos. 19 ¶ 41; 19-7 ¶ 15(t); 19 ¶ 40; 19-5 ¶ 15(t); 36-1 ¶ 40; 36-1 ¶ 40) (emphasis supplied). But Section 4 of the PSAs provide that following the commencement of the Due Diligence Periods:

> Buyer may only terminate this [PSA] under this Section for at least one of the following: (A) the ALTA Survey reflects a land area which is less than ninety-five percent (95%) of the area … and, as such, would make the Property unsuitable for the intended use of Buyer, (B) environmental, infrastructure, permitting and/or lack of access issues with the Property that would preclude the intended use of Buyer as stated herein…If the [PSA] is terminated under this paragraph and notice of such termination is delivered to Seller before the expiration of the Due Diligence Period, Seller will instruct the Escrow Holder to immediately return the total amount of Deposit to Buyer.

(Docket Nos. 19-5 § 4 ¶ 3; 19- 7 § 4 ¶ 3; 36 at 14-15; 36 at 14-15). Based on the uncontested facts and weighing all inferences in Defendants favor, the Court finds that there are open and genuine questions regarding whether Plaintiffs' cancellation of the PSAs fell under one of the named circumstances provided in Section 4 of

**Civil No. 22-1402(GMM)**
**Page -37-**

the PSAs. It is thus unclear if Plaintiffs are entitled to a return of the deposits being held in escrow. As such, the Court also denies Plaintiffs summary judgment motion on this claim.

### V.   CONCLUSION

For the reasons stated above, the Court **DENIES** Plaintiffs' Motion for Summary Judgment.

IT IS SO ORDERED.

In San Juan, Puerto Rico, February 9, 2023.


s/Gina R. Méndez-Miró
GINA R. MÉNDEZ-MIRÓ
UNITED STATES DISTRICT JUDGE